GODFREY KOHL

*v.*

ULYSES LINDLEY *et al.*

1. DELIVERY—*as between the parties, not essential to a sale.* As a general principle, there must be a delivery of the article to complete the sale, but between the parties it is not indispensable. Even where the property is not cumbrous and may easily be delivered, actual delivery is not necessary to vest the title in the purchaser.

2. DELIVERY—*of bulky article—what constitutes.* Where L. purchased four ricks of hay at a stipulated price per ton, the same to be baled and weighed by him, and he actually baled seven bales therefrom and took it into his possession, offering to pay for it but refusing to bale more, alleging that it was unsound and unfit to be baled, there was all the delivery of which the article was susceptible.

3. FRAUD WHICH VITIATES A SALE — *a concealment of facts asked for.* To make the mere suppression of a fact, such a fraud as avoids the contract, there must be something more than a failure to communicate facts within the knowledge of the vendor—there must be a concealment, as by withholding information when asked for, or by using some device to mislead, thus involving act and intention.

4. And the distinction in such cases seems to be that the seller may let the buyer cheat himself *ad libitum,* but must not actively assist him in cheating himself. So, in a sale of hay where the seller was silent, and used no artifice to induce the purchaser to buy, and the hay was then in ricks, and proper diligence would have enabled him to detect its unsound condition, the sale was not fraudulent.

5. IMPLIED WARRANTY—*in case of fraud.* While it was formerly the doctrine that there was an implied warranty that the article sold was what it appeared to be, and that " a sound price warranted a sound commodity," the rule now is·that the vendor is not responsible for any defects unless he is guilty of a fraud.

6. *Exceptions to this rule.* Like all general rules this has its exceptions; as in case of sale by sample where the law implies a warranty that the bulk is in quality as good as the sample, and in case of a sale without opportunity for inspection, where the implied warranty is that the property is of a fair merchantable quality and condition, and fit for the use for which it is purchased; so also in case of an executory contract for the sale of personal property, where there is no stipulation on that subject.

7. CAVEAT EMPTOR—*when applied.* Where there is no fraud, and the buyer takes the article on inspection, or with opportunity to inspect, he cannot complain, and the proper rule is *caveat emptor.* Hence, this court has held that where there is neither fraud nor express warranty, the purchaser buys at his peril.

8. IMPLIED WARRANTY ON ARTICLES SOLD—*different from articles manufactured and sold.* In the case of articles manufactured by the seller, there is an implied warranty that they are manufactured in a workmanlike manner, but in case of a mere vendor of the article, if there is neither fraud nor an express warranty, the purchaser buys at his peril.

9. And where the parties contract about an article of merchantable quality, that is, marketable anywhere as a sound article of merchandise, the buyer might then receive a part and would be at liberty to show the actual defect in its quality as an excuse for neglecting to take the rest; but where the article is bought for a particular use, and it is fit for that use, the buyer must pay for it.

WRIT OF ERROR from the Circuit Court of Sangamon county; the Hon. E. Y. RICE, Judge, presiding.

The facts in this case sufficiently appear in the opinion of the Court.

Messrs. STUART, EDWARDS & BROWN, for the plaintiff in error.

·Mr. JOHN E. ROSETTE, for the defendants in error.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action originally commenced before a justice of the peace, and taken by appeal to the Circuit Court of Sanga-

mon county. The suit was brought to recover for hay sold by plaintiff in error to the defendants.

The cause was submitted to the court for trial without the intervention of a jury. On the trial of the cause, the plaintiff, to maintain the issue on his part, introduced, as a witness, Nicholas Our, who testified that, as agent for defendants, who were partners, he was sent by them to purchase the hay of the plaintiff; that he went to the plaintiff on the farm where the hay was; that he saw the hay in ricks and told the plaintiff that he came to purchase the hay for the defendants; that plaintiff told him he could have the hay for five dollars per ton; witness said that was too high; plaintiff then said that if he would take it in the rick, he could have it for $4.50 per ton; that he then purchased four ricks, containing from twenty to twenty-two tons, at $4.50 per ton; the hay to be baled and weighed by the defendants; the defendants afterward sent their men and baled seven bales of the hay from one of the ricks, each bale weighing four hundred and fifty pounds; that the men refused to bale any more, alleging to witness, but not in presence of the plaintiff, that the hay was unsound and not fit for baling; the defendants offered to pay plaintiff for the hay baled and refused to pay for the balance; that he could not say the hay was unsound, as he had not examined it; he bought some hay of the plaintiff, raised in the same field and in ricks thereon, and made no complaints about it; that the hay was good for feeding sheep, which was what the defendants wanted it for; the hay had remained on the place from which the plaintiff had removed; that in buying the hay, he, witness, supposed the hay was good, but nothing was said by plaintiff on that subject.

This was all the evidence for the plaintiff.

The defendants then introduced one Taylor, who testified that he had purchased the farm on which plaintiff raised the hay in controversy, and the ricks of which were standing at the time of his purchase; that he saw the hay after it was cut, and before it was stacked; that it was badly cured; was not merchantable hay, that it lay upon the ground, partly in

windrow and part in swath till it was badly injured; and on cross-examination stated the hay was not fit for horses, but would do to carry stock through the winter. This was all the evidence in the cause. The court found for the defendants; the plaintiff moved for a new trial, which motion the court overruled, and the plaintiff at the time excepted, and brings the cause here by writ of error to reverse the judgment.

The plaintiff in error insists: First, that the sale of the hay, as between the parties was complete; second, there was neither fraud nor warranty on the part of the plaintiff; third, if the contract should be treated as executory, it was broken on the part of the defendants without fault of the plaintiff, and he was entitled, if to nothing more, at least to nominal damages, and a judgment for costs; and that for the hay actually baled and thus appropriated by the defendants, the plaintiff was clearly entitled to compensation, and although they offered to pay for this, they did not make and keep good the tenders as required by law.

The defendants controvert these propositions, and insist that the tendency of all the modern authorities is to enlarge the responsibility of the seller, or to construe every affirmation made by him to be a warranty, and frequently to imply a warranty on his part from facts and circumstances wherever they were relied on by the buyer. He insists that upon a sale of chattels, a warranty is implied: First, that the seller has a valid title; second, that the subject-matter is merchantable; third, that it is reasonably fit for the use for which it is sold (bought); fourth, that it has no latent defects known to and concealed by the seller; and, fifth, that it corresponds to the sample, if sold by sample.

The facts are few and simple, and the question presented by them, we think, has been settled by several decisions of this court, rendering it unnecessary for us to go over the whole ground this controversy is supposed to occupy.

As to the first point made by plaintiff: Was the sale complete between the parties? As a general principle there must be a delivery of the article, to complete the sale, but between

the parties, it is not indispensable or essential. Even where the property is not cumbrous and may be readily delivered, actual delivery is not necessary to vest the title in the purchaser. *Wade* v. *Moffett*, 21 Ill. 110, and cases there cited, where this doctrine is fully examined. *Howard* v. *Babcock*, id. 259 ; *Lidwell* v. *Lobly*, 27 id. 438. Nothing remained to be done by the vendor, for the hay was to be baled and weighed by the defendants. All they had to do was to bale it, weigh it, and pay the stipulated price. The baling was for the convenience of handling, and the weighing to determine how much money the plaintiff should have, at four dollars and fifty cents per ton. In the case of *O'Keefe* v. *Kellogg*, 15 Ill. 347, this court said, where any thing remains to be done to complete the contract, such as ascertaining the quantity or the delivery of possession, the title does not pass till the contract is thus completed, while the title may pass where the contract is completed, although something may remain to be done under the contract in order to ascertain the amount to be paid by the purchaser. In such a case, if the possession is delivered under the contract, and such is the intention of the parties, the title may pass although the quantity is subsequently to be ascertained. Id. 352. And again the court say, the parties certainly had a right to make an agreement, and to do acts which would pass the title, leaving the quantity to be subsequently determined. And by way of illustration, a case is supposed of one selling a quantity of grain in a warehouse to be shipped to a distant place, by the purchaser, the quantity to be then determined, no doubt the title would pass so soon as the grain should be put on board the purchaser's boat, although the quantity was still to be ascertained. So here, the hay was put in the possession of the men employed by the defendants to bale it, who actually did bale, from one of the ricks, seven bales, each bale weighing four hundred and fifty pounds. If delivery was essential, here was a delivery consistent with the nature of the article sold. Like the sale of a standing crop, or a crib of corn, the law does not require the purchaser to take manual possession, not of the growing crop until it is time to harvest it, and not of the

crib of corn because it is cumbrous, and an actual immediate removal is not possible. That between the parties even though the article may be readily delivered, as in Moffett's case, delivery is not necessary.

In the case of *May* v. *Tallman*, 20 Ill. 443, it was held an actual removal of an entire mass of a cumbrous article is not necessary to constitute a delivery and change of possession, as, where one party is to deliver another three hundred bushels of corn, and points to a crib in which it is, which is accepted, and two wagon loads are taken out of it, this constitutes a good transfer of title. Here the defendants purchased four ricks of hay, supposed to contain twenty or twenty-two tons, at a stipulated price per ton, to be baled and weighed by the purchasers, who actually baled seven bales from one of the ricks, and took it into their possession, offering to pay for it, but refusing to take any more, alleging it was unsound and unfit to be baled. Here was all the delivery of which the article was susceptible.

The next question is, was there any fraud or warranty on the part of the plaintiff?

The defendants contend there was fraud in the sale, because the hay was unsound when the plaintiff stacked it, and he concealed that fact from the defendants' agent, and that he so spoke and acted as to mislead and deceive the defendants when the contract was made. There is no proof whatever that the plaintiff said or did any thing in the least calculated to mislead or deceive the defendants. They did not, in person, make the contract. It was made by their agent, and he testifies to no act or word having such tendency. He complained that $5 per ton was too much for the hay, when the plaintiff agreed if he would take it in the rick he could have it for $4.50 a ton. This was all that was said, whereupon the defendants' agent purchased, as he says, four ricks, the hay to be baled and weighed by the defendants.

As to the unsoundness of the hay, and the concealment of that fact from the agent by the seller, is that such a fraud as will vitiate the sale?

The defendants insist that it is in all cases where both parties have not an equal access to the means of information, citing 2 Kent's Com. 482; and, further, he insists that the concealment of any latent defect which could not have been discovered by the vendee through the exercise of proper diligence, will avoid the contract, citing numerous cases.

How far a person is bound, when dealing with another, to communicate facts wholly within his own knowledge, is a question about which the ablest jurists differ. Testing it by the code of moral ethics, there can be no doubt about it, nor is there any doubt when tested by the rules of the civil law, both codes would require a communication by the vendor of every material fact within his knowledge and unknown to the purchaser, which might have an influence in making the contract. Otherwise, the parties would not stand on equal ground, the vendor having a decided advantage over the purchaser. But this rigid principle has not been adopted into the common law. The doctrine in 2 Kent's Com. 490, is said to be where one party possesses a knowledge of facts which, from the situation of the property, the other cannot know, a suppression of such facts would render a contract invalid.

To make the mere suppression of a fact, such a fraud as will justify a court in declaring the contract void, we believe the more modern and more correct doctrine to be, there must be something more than a failure to communicate facts within the knowledge of the party selling—there must be concealment, and that may consist in withholding the information when it is asked for, or by making use of some device to mislead, thus involving act and intention. Thus Parsons, in his able treatise on the law of contracts, the most modern work on that subject to which we have access, says: "If the seller knows of a defect in his goods which the buyer does not know, and if he had known would not have bought the goods, and the seller is silent, and only silent, his silence is nevertheless a moral fraud and ought, perhaps, on moral grounds, to avoid the contract. But this *moral* fraud has not yet grown into a *legal* fraud. In cases of this kind there may be circumstances which cause this

moral fraud to be a legal fraud, and give the buyer his action on the implied warranty, or on the deceit.

" And, if the seller be not silent, but produce the sale by means of false representations, then the rule of *caveat emptor* does not apply, and the seller is answerable for his fraud. But the weight of authority requires that this should be *active* fraud. The common law does not oblige a seller to disclose all that he knows which lessens the value of the property he would sell. He may be silent, leaving the purchaser to inquire and examine for himself, or to require a warranty. He may be silent and be safe; but, if he be more than silent, if by acts, and certainly if by words, he leads the buyer astray, inducing him to suppose that he buys with warranty, or otherwise preventing his examination or inquiry, this becomes a fraud, of which the law will take cognizance. The distinction seems to be, and it is, grounded upon the apparent necessity of leaving men to take some care of themselves in their business transactions. The seller may let the buyer cheat himself *ad libitum,* but must not actively assist him in cheating himself." 1 Parsons on Contracts, 461.

Here the seller was silent; he made no representations of any kind as to the quality of the hay, and used no artifice to induce the defendants' agent to buy. The hay was there in ricks, and it was quite easy for the purchaser to satisfy himself as to its quality by pulling a few handsfull from the ricks. Damaged hay, as every one knows, can be very readily detected by the color and smell. It was in the power of the purchaser to test, in this way, every one of the ricks. It was his own folly that he did not do so. It was lawful for the seller to suffer the buyer to cheat himself *ad libitum,* so that the seller does not actively assist him therein. Proper diligence would have enabled the buyer to detect the unsound condition of the hay. The charge of fraud is in no wise established.

As to the implied warranty that the hay was merchantable, on this topic the books show great diversity of opinion. The doctrine of the civil law undoubtedly is that there is an implied warranty that the article sold is what it appears to be, and is

sold as sound and of a merchantable quality. The maxim in that code is " a sound price warrants a sound commodity," the seller taking the risk of all defects which are not disclosed at the time of the sale.    Before Lord MANSFIELD's time, that was understood to be the rule of the common law also.    Ever since his opinion in 1778, in the case of *Stuart* v. *Wilkins*, Douglas, 20, the rule is recognized which he there laid down, that the vendor of property was not responsible for any defects, unless he was guilty of a fraud, or had made an express warranty.

Blackstone in his commentaries so states the rule, 2 Bl. Com. 451, and with but slight and occasional departure, has been followed by all the common law courts of England and of this country.    This doctrine was fully examined by this court, in the case of *Misner et al.* v. *Granger*, 4 Gilm. 69, and fully recognized.

Yet, like most general rules, it, also, has its exceptions, as in the case of goods sold by sample, there the law implies a warranty, that the bulk is of a quality as good as the sample; and in executory contracts for the sale of personal property, the law implies as a part of the contract in the absence of any express stipulation to that effect, that the property shall be of a fair merchantable quality and condition, and fit for the uses for which it is purchased.    And the rule is the same where the purchase is made without sample, or without an opportunity for inspection.    In such cases it would be unjust to say, " let the buyer take care," when he has no opportunity of looking at the article.    If, however, there is no fraud, and he takes the article on inspection, or with an opportunity to inspect it, he has no right to complain.    The maxim of *caveat emptor* is then properly applicable to him.    Id. 74.

In the case of articles manufactured by the seller, this court held, in *Archdale* v. *Moore*, 19 id. 565, there is an implied warranty that they are manufactured in a workmanlike manner; but in the case of a mere vendor of the article, if there is neither fraud nor an express warranty, the purchaser buys at his peril.    And again in *Nichols* v. *Guibor*, 20 id. 285, it was said the purchaser of an article not warranted as to quality must

take the hazard of his bargain. In this case the article sold was a plow.

The case of *Babcock* v. *Trice*, 18 id. 420, is relied on by defendants' counsel as sustaining him in the position he takes of an implied warranty that the hay was merchantable. That case goes far to sustain him, for the court distinctly say, that the acceptance of the corn under an executory contract, with opportunity of inspection at the time of delivery without complaint, affords but a mere presumption that it was of the quality contemplated by the parties, and does not preclude the buyer from showing and setting up the actual defect in quality and condition.

If it be held in the case before us, that the parties were contracting about an article of merchantable quality, that is to say, marketable anywhere, as a sound article of merchandise, the case cited would tend to defeat a recovery, for although the buyer accepted the hay and baled one of the ricks, yet he is at liberty to show the actual defect in its quality and condition as an excuse for declining to take the rest, which he did show by the testimony of Taylor.

But if it be taken in a more restricted meaning, that the article was merchantable and fit for the use for which it was bought, as it should be, then the plaintiff ought to recover, for the proof is, it was bought for the purpose of feeding to sheep, and that it was fit for that purpose and would do to carry stock through the winter. It was not merchantable hay fit for horses, but was merchantable for the purpose for which it was bought. Suppose the corn in Babcock's case had been purchased for distilling, and it had been proved it was fit for that, the judgment would have been the other way.

The case of *Fish et al.* v. *Roseberry*, 20 id. 288, refers to the case of *Misner* v. *Granger*, 4 Gilm., above cited upon one branch of it. The contract was to deliver wheat then in the stack in the fall of the same year in which it was harvested. The delivery was delayed until the following summer; and when offered to the purchaser he objected to receiving it, as it was damp and unmerchantable and not such wheat as he had

contracted to purchase. The court conclude on this point by saying, when in the stack there was an implied warranty that the wheat was merchantable. There was no proof in that case that the wheat was purchased for any other than the use to which it is so universally applied. It is converted into flour of which is made "the staff of life," and for that purpose, must be sound and merchantable, not damp and musty. Had the proof been it was not intended for flour, but, damp and musty as it was, it was fit for the uses for which it was purchased, the plaintiff would have recovered.

We think on the evidence and on authority there was a fair sale of this hay in the ricks as they stood, for a stipulated price per ton, and for which the defendants must pay the plaintiff the price per ton as agreed.

The *data* for arriving at the weight is furnished approximately by the plaintiff's witness, Nicholas Our.

The judgment is reversed and the cause remanded.

*Judgment reversed.*